**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Tel:    (619) 762-1910
Fax:    (858) 313-1850

**BURSOR & FISHER, P.A.**
Neal J. Deckant (SBN 322946)
ndeckant@bursor.com
Luke Sironski-White (SBN 348441)
lsironski@bursor.com
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Tel.:    (925) 300-4455
Fax:    (925) 407-2700

*Attorneys for Plaintiffs*
*and Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.L. and J.P., individually on behalf of themselves and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>THANG BOTANICALS, INC., and FTLS HOLDINGS LLC, collectively doing business as 7ΩHMZ, and DOES 1-10, inclusive,<br><br>    Defendants. | Case No. 3:25-cv-03191-TLT<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs M.L. and J.P.[1] (collectively "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Thang Botanicals, Inc. (d/b/a 7ΩHMZ, 7-OHMZ, or 7OHMZ ("Thang")) and FTLS Holdings, LLC ("FTLS") (collectively, "Defendants" or "7-OHMZ") and Does 1 through 10, inclusive.

### NATURE OF THE ACTION

1.      This is a civil class action against Defendants for their false, misleading, deceptive, and negligent sales practices regarding their 7-Hydroxymitragynine ("7-OH") tablet products (collectively, the "7-OH Products" or the "7-OH Tablets").  7-OH is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*).  Kratom is both a plant and a drug.  The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects.  Use of kratom in the United States was practically non-existent until the last decade.  Since then, Kratom has become a massively popular substance in the United States.  This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and Mitragynine.

2.      However, what consumers do not know is that the opiate-like effects produced by Mitragynine and 7-OH are not the result of novel chemical interactions in the brain.  Rather, these alkaloids are behaving, in part, exactly like opioids.  That is, the Mitragynine and 7-OH found in the kratom plant activate the same opioid receptors in the human brain as morphine, heroin, and other opiates.  Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects.

3.      But it gets worse.  While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine.  Indeed, some studies have shown that 7-OH is ten times more potent <u>than morphine</u> in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction.

---

[1] Because this action concerns issues of addiction and medical status, Plaintiffs are filing under their initials for the sake of their personal privacy. Plaintiffs are reasonable consumers who fell victim to Defendants' omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result.  Since addiction issues are still wrongly stigmatized, Plaintiffs are filing this matter anonymously but will reveal their names as necessary to the Court under seal.

THIRD AMENDED CLASS ACTION COMPLAINT                                                    1

4.      In raw kratom though, 7-OH does not appear in great quantities, making up less than 0.05% of kratom powder by weight.  For raw kratom powder consumers this means that normal doses of kratom powder do not contain enough 7-OH to produce the intense narcotic effects (and concomitantly strong withdrawals) characteristic of traditional opioids.  This is not to say that kratom can be consumed with abandon—kratom is highly addictive and will induce opioid withdrawal symptoms if taken too frequently—rather, this is to say that in comparison to raw kratom addiction, the withdrawal symptoms from pure 7-OH consumption would be substantially worse.

5.      Defendants do not sell raw kratom.  Defendants' Tablets are pure 7-Hydroxymitragynine. 14mg of it to be precise.  This makes Defendants' 7-OH Tablets substantially more addictive than even kratom, and the withdrawal symptoms significantly worse.

6.      Almost as soon as Defendants' Tablets hit the market the horror stories began to surface. Consumers stating that they were blindsided by these Tablets, thinking they were just a different form of kratom, and suffering through the worst withdrawal symptoms they had ever experienced – worse than heroin by some accounts.

7.      The general public is largely unaware of kratom and its addictive potential.  So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a tortuously complex name, the public is even less aware of it and its negative effects.

8.      When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine; they do not think of 7-OH Tablets or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids.  7-OH is extremely addictive and, as a result, tens of thousands of unsuspecting consumers have developed 7-OH dependencies that cause them serious physical, psychological, and financial harm.

9.      Defendants have intentionally failed to disclose these material facts regarding the dangers of 7-OH consumption anywhere on its 7-OH Tablets' labeling, packaging, or marketing material.  As a result, Defendants have violated warranty law and state consumer protection laws.

10.      Defendants rely on their Products' vague packaging and consumers' limited knowledge of 7-Hydroxymytragynine to get unsuspecting people addicted to their Products and reap substantial profits

from these addictions. Defendants rely on this ignorance and do nothing to correct it. Such activity is outrageous and is contrary to California law and public policy.

11.    Plaintiffs seek relief in their action individually, and as a class action, on behalf of similarly situated purchasers of Defendants' Products, for the following violations of: (i) California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* (the "UCL"); (ii) California's Consumer Legal Remedies Act, Civil Code § 1750, *et seq.* (the "CLRA"); and (iii) Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.* (the "UTPA").

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes, have a different state citizenship from Defendants.

13.    This Court has personal jurisdiction over Defendants because Defendants are entities with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper. Moreover, 7OHMZ principal place of business is in this District.

14.    Venue is proper in this District because Defendant 7OHMZ is headquartered in this District.

## GENERAL ALLEGATIONS

**A.    Background and Pharmacology of Kratom and 7-Hydroxymitragynine**

15.    "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century. Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium. Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

16.    Kratom is the most widely used drug in Thailand. This popularity does not mean Thailand believes kratom is harmless. To the contrary, Thailand understands that kratom is dangerous, as

THIRD AMENDED CLASS ACTION COMPLAINT

demonstrated by its ban of the substance in 1943.[2]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

17.    Kratom's unknown and inconsistent effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

18.    In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

19.    To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

20.    The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds. The primary alkaloids in kratom leaves responsible for the kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

21.    MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

22.    Defendants' Products are unique as compared to most other kratom products on the market and represent a "next gen" iteration of the substance in terms of addictiveness and harm-potential.

23.    In other words, in raw kratom, 7-OH typically only occurs in doses which are no greater than 2% of total alkaloid content (or 0.05% by weight).  7-OH is different than MG because, although

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

THIRD AMENDED CLASS ACTION COMPLAINT                                                                    4

both interact with the mu-opioid receptor,[4] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor which is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated, doses it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

24.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[5]  Both MG and 7-OH were found to be more potent to the mu-opioid receptor than morphine when taken via oral administration.

25.    Accordingly, kratom products are referred to as a "quasi-opiate" by health professionals because of their opioid-like characteristics.  This is doubly true of 7-OH, which interacts solely and more intensely with the mu-opioid receptor.

26.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

27.    All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

28.    Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep

---

[4] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[5] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

THIRD AMENDED CLASS ACTION COMPLAINT

disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

29.    Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal.  Use is no longer is about getting high, but about not feeling "sick."

**B.    Kratom and 7-OH Use and Addiction in the United States**

30.    Over the past decade, kratom has exploded in popularity within the United States.  As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States.  Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

31.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

32.    7-OH is new to the market.  Having only arrived in 2022 or even more recently. Defendants' Products, for instance, came to market in 2023.

33.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom they may not have heard of 7-OH.

34.    7-OH sellers advertise it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day.  Some even assure consumers that 7-OH is a non-addictive way to deal with opioid withdrawal.  These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of the corresponding harms of 7-OH use.

35.    As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH

and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

36.    The reports from addicted 7-OH users are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH , how difficult it was to stop their 7-OH use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of September 2024:[6]

    i.    In one post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:**

I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like 7Ohmz might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using 7ohmz though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

    a.  **Another user responded**:

I don't know how you're cold turkey from the 7Ohmz, I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The 7ohmz withdrawal is very scary, worse than any opiate I've been on.

    b.  **Another User Responded**:

I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

    ii.    In separate post titled **7ohmz,** another user wrote:

Guys I desperately need help. I have been taking 7 Ohmz for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental

---

[6] *See* https://www.reddit.com/r/quittingkratom.

health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

iii.    In another post titled **Could not and would not believe you all…**another user wrote:

Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the 7-Ohmz tablets, a full pack of three a day. I told myself you were all exaggerating.  I told myself you were all weak.  Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop."  I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared.  If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high.  There's so much more to life than getting high.  Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏

37.    Other experiences with kratom (not necessarily 7-OH products) described on the subreddit are similarly horrifying:

i.    **One user wrote:**

I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

ii.    **Another user shared:**

I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

iii.    **Another user shared:**

THIRD AMENDED CLASS ACTION COMPLAINT                                                           8

> I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly… Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

38.    This Internet forum is filled with other accounts like these, and the stories are consistently the same—well-meaning people were looking to feel better by taking with what they thought was an "herbal supplement," only to develop an opioid-like addiction. This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions. However, Defendants' Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

39.    Consumers who knew the truth about 7-OH may not have purchased Defendants' Products or would have paid less than they did for them.

**C.    Defendants Knew or Should Have Known they were Selling a Highly Addictive Drug to Unsuspecting Consumers**

40.    Defendants manufacture their 7-OH Tablets in a highly specialized lab and utilize highly technical knowledge about kratom and its alkaloids to synthesize their Products. Thus, Defendants are acutely aware of the addiction risks posed by their Products.

41.    In an appearance on The Kratom Advocacy Podcast on September 9, 2024, Gregory Dalli (CFO for both Defendants 7OHMZ and FTLS Holdings) stated that "7-Hydroxymitragynine in specific is a really *perfect key for the MU opioid receptor*, and the reason why that is such an important thing is *you don't need to take as much of it to get an effect versus if you look at morphine*."[7] Additionally, in that same podcast interview, Gregory Dalli is informed by the interviewer that consumers have stated the

---

[7] *See* https://www.youtube.com/watch?v=8lBSL_HTW4I, at 3 minutes and 10 seconds.

Product "has ruined [their] li[v]e[s]." The interviewer then informs Gregory that he has tried Defendants' 7-OH Product and can see how one can get addicted to it.[8]

42. Additionally, in a YouTube video titled *The Most Dangerous Drug in the Smoke Shop*, content creator "Goblin"—known for his candid, firsthand reviews of drug-related substances and harm reduction commentary—described deeply disturbing outreach from individuals connected to the 7OHMZ brand. Goblin, who has openly shared his struggles with addiction, particularly took issue with an unsolicited email he received from "dev@7ohmz.com," in which the company attempted to send him free samples of their flagship product: a high-potency isolate of the kratom alkaloid 7-hydroxymitragynine. The email read, in part:

> Hey Goblin,
>
> First off I just want to say that we love your youtube channel and all the drug reviews you do. We are a new company in the kratom industry and we just released our flagship product. It's an isolate of the most potent kratom alkaloid 7-hydroxymitagynine. Based on your review videos we think you will really love our product and we would like to send you some free samples to try. If you are interested, shoot me a reply with your address and we'll get a package with some samples out in the mail ASAP.
>
> Thanks for your time,
>
> The 7OHMZ Team

43. Following that initial contact, Goblin also received a text message from a purported insider within 7OHMZ or the broader "7OH" industry, who admitted to playing a key role in launching the product line and confessed to being addicted to it himself. The sender wrote:

> I wanna have a real ass conversation with you about the whole 7oh industry. I was one of the people who helped set this whole thing into motion and I know more about it than 99% of people. There's things that as a company we can't 'legally' say, but I don't want to have to watch my words because of liability reasons. [Redacted Name] said you wanted to record the conversation, so that complicates things further. But I really just want to be real with you and give you my perspective as someone with chronic pain, someone who is actively addicted to 7oh, and someone who helped build this monster.
>
> Funny thing is, in the early days I tried contacting you through your email because I wanted to send you some samples and get your opinion on what we we're doing.
>
> So lmk if you have any ideas on how we can have a truly open dialogue where I don't have to watch my words or worry about our conversation biting the whole industry in the ass.

---

[8] *Id.* at 28 minutes and 55 seconds.

THIRD AMENDED CLASS ACTION COMPLAINT                                                           10

44.    Goblin's response was swift and clear:

Yo – just for clarity all further contact will be recorded and posted publicly, including these messages and all future phone calls. What's on your mind? I personally think people like you are pretty shitty for the community.

According to the video, the anonymous "insider" never replied again. Goblin's outrage — expressed both in the video and across his platform — centered on the fact that the 7OHMZ representatives knowingly attempted to send highly potent and addictive substances to a person they likely knew was in recovery, underscoring a reckless disregard for public health and individual safety.

45.    Despite all of this knowledge, Defendants failed to disclose 7-OH's addictive potential to their customers on their Products' packaging.

46.    Defendants have no excuse for their lack of a detailed disclaimer warning on their 7-OH Tablet's packaging of 7-OH's harms.  The pharmacological effects of 7-OH have been thoroughly studied, and it is well-established that 7-OH acts on the same mu-opioid receptors in the brain as traditional opioids do.  Further, there are widespread reports and studies of other addiction and dependency issues.

47.    Defendants therefore know or should have known that kratom users can develop an addiction. Yet, Defendants fail to disclose this material fact on their advertisements or on their Products' packaging.

48.    The very fact that Defendants possesses the capability to manufacture their 7-OH Tablets shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of addiction that it poses to consumers.  Despite this, Defendants market their 7-OH Products as if they are nothing more than over-the-counter supplements.  Indeed, the packaging looks more like allergy medication than a dangerously strong opioid, and Defendants' glossy website and design language obfuscates the very real truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

49.    For instance, in the image pictured below, taken from Defendants' website, Defendants gives customers a wink and a nod that 7-OH is "known for its unique effects" which "interacts with receptors in an interesting way."  While some customers who have experience with Defendants' Products may have a sense for what this means, regular consumers do not.  Like Plaintiff's experience described below, consumers may walk into the local headshop and see Defendants' Product and be enticed into purchasing it because, they think, it looks inviting and if it was dangerous there would be a warning on the package.

THIRD AMENDED CLASS ACTION COMPLAINT                                    11



**WELCOME TO 7-OHMZ**

ADVANCED KRATOM ALKALOIDS

Introducing our new 7-Hydroxymitragynine tablets!

Discover the natural wonder of 7-OHM, an active metabolite derived from the Kratom leaf. This remarkable terpenoid indole alkaloid, known for its unique effects, can provide you with a potentially enjoyable experience.

50.    It gets worse.  Just like a street-level drug dealer might do, Defendants have authorized stores, and in some cases, instructed them, to give the tablets out as free samples.  The sample pictured below was found by Plaintiff's counsel in a 7ΩHMZ-branded "free sample" box.  This sample bears zero warning that the Product interacts with the *opioid* receptors, that it is substantially more addictive than kratom, or that continued use may result in severe withdrawal symptoms.  The very act of giving out "free samples" is a signal to consumers that the Product is safe and harmless.  Without the warning, consumers have no reason not to try the sample.  They may even enjoy the effects and continue using the Product because they do not believe a Product with such substantial addictive potential would not bear some kind of warning.  This is outrageous, a moral and ethical failure, and in contravention of public policy.



51.    Reasonable consumers looking at the Products' packaging and online store description would not presume that 7-OH is highly addictive.

52.    Nowhere on the packaging does Defendants mention that 7-OH presents the same addiction problems that former opioid users and any other consumers would want to avoid. Consumers seeking help as they come off opioids may be drawn in by Defendants' misleading statements about 7-OH without knowing that they risk trading one addiction for another.

53.    As a 7-OH product seller, manufacturer and/or distributor, Defendants occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH.

54.    The information provided on Defendants' Products' packaging in particular is woefully sparse. Another representative image of one of Defendants' Products is depicted below:



55.    On Defendants' website homepage, they market their 7-OH Tablets with the following:

Introducing our new 7-Hydroxymitragynine tablets! Discover the natural wonder of 7-OHM, an active metabolite derived from the Kratom leaf. This remarkable terpenoid indole alkaloid, known for its unique effects, can provide you with a potentially enjoyable

experience. Derived from the Kratom plant and often referred to as '7-OHM,' this unique compound interacts with receptors in an interesting way.

56.     Additionally, Defendants' website's homepage has a section called "What is 7-OHM?" that contains the following description:

7-Hydroxymitragynine is a terpenoid indole alkaloid from the plant Mitragyna speciosa, commonly known as Kratom. It is often referred to as '7-OHM. It was first described in 1994 and is a natural product derived from the mitragynine present in the Kratom leaf. It is considered an oxidized derivative and active metabolite of mitragynine. 7-OHM binds to opioid receptors like mitragynine, but research suggests that 7-OHM binds with greater potency and contributes heavily to the analgesic activity of mitragynine as a metabolite.

57.     In this description, Defendants admit that their 7-OH Products contain the more potent and more harmful kratom alkaloid (7-OH), instead of the less potent form (MG), but Defendants fail to disclose on the Products' packaging the heightened harm that corresponds with the increased potency of their 7-OH Products.

58.     Despite these "informative" introductions to their Products, nowhere in any of these disclaimers or descriptions do Defendants provide any warning to consumers on the Products' packaging that their Products interact with opioid receptors or are highly addictive and should not be taken on a daily basis, or note any of the numerous negative side effects and withdrawal symptoms caused by their Products.

59.     Indeed, the entire contents of the warning on the Products' packaging is a bog-standard disclaimer—written in miniscule text—that consumers should consult a healthcare professional before use and that Defendants are not liable for "misuse of this Product." The warning then directs consumers to a legal disclaimer page on Defendants' website.

60.     A boilerplate disclaimer and suggestion that consumers check out a website is plainly insufficient. This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

61.     Addiction is a disease. As such Defendants' 7-OH Tablets pose an unreasonable health hazard, and Defendants had and have a duty to disclose this fact *on their Products' packaging.*

62.     What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain. It looks as innocuous as a vitamin supplement.

THIRD AMENDED CLASS ACTION COMPLAINT                                                                                          14

63.     Defendants, through their misleading advertising and their failure to disclose 7-OH's addictive properties on their Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell their Products and get users addicted to them.

64.     Defendants fail to disclose 7-OH's addictive potential because Defendants know that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendants' financial detriment.

65.     As of April 2024, Plaintiffs are informed and believe that Defendants have added an addiction warning to the product packaging. While the addition of such a warning may potentially impact the availability of injunctive relief—depending on its adequacy—it does not extinguish or diminish Plaintiffs' and Class members' claims that arose prior to the inclusion of the warning.

66.     By any metric, Defendants' conduct is immoral, unethical, and contrary to California public policy.

67.     The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendants are creating more addicts for no reason other than to line their pockets, without adequate disclosure of their Products' risks through the use of false and misleading packaging and marketing.  That cannot– and should not–stand, at least when Defendants' conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

## PARTIES

68.     Plaintiff M.L. is a resident and citizen of Portland, Oregon. He first encountered 7-hydroxymitragynine in February 2024, when a smoke shop employee recommended it. The employee did not provide any information regarding potential risks, including addiction, dependence, or withdrawal symptoms. Plaintiff M.L. had never heard of 7-hydroxymitragynine and had no way of knowing how much more potent and dangerous it was than traditional kratom. He began using Defendants' 7OHMZ branded tablet products around the same time—just three weeks after the birth of his daughter. At that time, he was experiencing fatigue, sleep disruption, and elevated anxiety. He purchased the product—a three-pack of 14 mg tablets—from Mellow Mood Smoke Shop in Portland. He examined the packaging before buying it. There were no warnings about addiction or dependency or other indication of potential harm.

69. Initially, Plaintiff M.L. took one tablet per day. By March 2024, he switched to purchasing the six-pack version of the same 14 mg tablets, realizing it was more cost-effective. As his tolerance grew, so did his dosage—two tablets, then three, and eventually the entire six-pack each day. By July 2024, he was spending approximately $270 per week—roughly $1,000 a month—to maintain his use. Around this time, with his paternity leave nearing its end and a new job approaching, Plaintiff M.L. attempted to quit. He wanted to reclaim his life for himself and for his family, and to his credit, he was temporarily successful, using raw kratom powder to blunt the withdrawal symptoms. Even then, the symptoms were brutal: cold sweats, tremors, crushing anxiety, cravings, muscle spasms, insomnia, exhaustion, watery eyes, irritability, and other classic signs of opioid-like withdrawal.

70. By September 2024, his cravings and post-acute withdrawal symptoms had become too much to bear. He relapsed. Within weeks, he was back to using a full six-pack daily. In February 2025, he tried again to quit—but failed. As of now, Plaintiff M.L. remains dependent on 7-OH. Had the 7OHMZ packaging he initially purchased included a clear warning that the Product was so addictive—just a sentence— Plaintiff M.L. would have never bought it.

71. Plaintiff J.P. is a resident and citizen of San Juan Capistrano, California. He first tried 7-OH in or around September 2024. He initially purchased and used 7OHMZ blister pack tablets for about two months until his local smoke shop ran out of the Products. In November 2024, Plaintiff J.P. began using other kratom products as a substitute but even so was experiencing acute withdrawal symptoms from discontinuing the use of 7OHMZ. He then attempted to find other shop locations to purchase 7OHMZ to manage his withdrawal symptoms, which resulted in him having to drive to Oceanside, California. Plaintiff J.P. then resumed use of 7OHMZ throughout December 2024. At some point in December 2024, it became abundantly clear to him that he was physically addicted to Defendant's 7-OH Products, would suffer severe withdrawals effects without them, and that he *only* found himself using 7OHMZ to avoid going through serious withdrawals. At that point, he was using seven packs (or 21 tablets per day). In January 2025, Plaintiff J.P. was forced to quit his job and seek help from a rehabilitation center to push through his withdrawal symptoms. Had Plaintiff J.P. knew that Defendants' Product was highly addictive, by way of warning on the Product's packaging, he would have never purchased it.

72.     Defendant Thang Botanicals, Inc., d/b/a 7ΩHMZ, is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Thang owns and operates the 7-OHMZ website, www.7ohmz.com, and also advertises, markets, distributes, and sells its 7-OHMZ Products in California, Oregon, and throughout the United States.

73.     Defendant FTLS Holdings, LLC is a Delaware entity with its principal place of business in San Francisco, California.  Defendant FTLS Holdings, LLC owns the trademark for the "7ΩHMZ" brand.  Defendant FTLS Holdings, LLC is owned and operated by Gregory Dalli, who is also the CFO of Defendant Thang Botanicals/7ΩHMZ.  FTLS and Thang/7ΩHMZ operate in furtherance of a single enterprise, and are so financially intertwined as to be considered one and the same entity for purposes of this lawsuit.

74.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-10, inclusive, and therefore sues such defendants by such fictitious names.  Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants are, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein.  Plaintiffs reserve the right to amend this Complaint to set forth the true names and capacities of these defendants when they are ascertained, along with appropriate charging allegations, as may be necessary.

## CLASS ALLEGATIONS

Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

> All persons who, within the applicable statute of limitations period, purchased 7-OHMZ kratom products while in California (the "California Class").

> All persons who, within the applicable statute of limitations period, purchased 7-OHMZ kratom products while in Oregon (the "Oregon Class").

75.     Excluded from the Classes are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action.  Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection

THIRD AMENDED CLASS ACTION COMPLAINT                                              17

with his motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

76. ***Numerosity***: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of consumers throughout California, Oregon and the United States who have been damaged by Defendants conduct as alleged herein. The precise number of members of the Classes is unknown to Plaintiffs at this time.

77. ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

a. whether the labels on Defendants' Products have the capacity to mislead reasonable consumers;

b. whether Defendants knew that 7-OH is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

c. whether Defendants' conduct alleged herein violated the UTPA;

d. whether Plaintiffs and the Classes are entitled to damages and/or restitution; and

78. ***Typicality***: Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Class members sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' failure to inform Plaintiffs and all others similarly situated that their Products are highly addictive and akin to opioids.

79. ***Adequacy***: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no antagonistic or adverse interests to those of the Classes.

80. ***Superiority***: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial

resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

81.    Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiffs, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of Defendants wrongdoing.

82.    Based on the forgoing allegations, Plaintiffs' claims for relief include those set forth below.

83.    Plaintiffs are informed that Defendants keeps extensive computerized records through their online sales data, as well as through, *inter alia*, general marketing programs.  Defendants have one or more databases through which a significant majority of members of the Classes may be identified and ascertained, and Defendants maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

**FIRST CAUSE OF ACTION**
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code, §§ 17200, *et seq.***
***(On Behalf of Plaintiff J.P. and the California Class)***

84.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs.

85.    Plaintiff J.P. brings this cause of action individually and on behalf of the members of the California Class against Defendants.

86.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

87.    As alleged below, Defendants have committed unlawful, fraudulent, and/or unfair business practices under the UCL by (a) representing that their 7-OH Products have certain characteristics that they do not, in violation of California Civil Code § 1770(a)(5); (b) advertising goods and services with the

intent not to sell them as advertised, in violation of California Civil Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that their 7-OH Products pose a serious risk of addiction.

88.    Defendants' conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

89.    Defendants' conduct has injured Plaintiff J.P. and the California Class that he seeks to represent in that he paid money for a Product that he would not have purchased or paid more than he would have but for Defendants' failure to disclose the addictive nature of their 7-OH Products. Such injury is substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendants' conduct. Since consumers reasonably rely on Defendants' labels, and thus also Defendants' omissions, consumers themselves could not have reasonably avoided such injury.

90.    Moreover, Defendants' Products pose an unreasonable health hazard because 7-OH is highly addictive and may induce serious withdrawal symptoms. Accordingly, Defendants had a duty to consumers to disclose on the Products' labels that their 7-OH Products pose a risk of physical and psychological dependence.

91.    Pursuant to California Business and Professions Code section 17203, Plaintiff J.P. and the California Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff J.P. and the other California Class members; (b) disgorge all revenues obtained as a result of Defendants' violations of the UCL; and (c) pay Plaintiff J.P. and the California Class members' attorney's fees and costs.

92.    Here, equitable relief is appropriate because Plaintiff J.P. may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff J.P. would be left without the parity in purchasing power to which he is entitled.

THIRD AMENDED CLASS ACTION COMPLAINT                                                                20

**SECOND CAUSE OF ACTION**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code, § 1750, *et seq.***
***(On Behalf of Plaintiff J.P. and the California Class)***

93.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

94.    Plaintiff J.P. brings this claim individually and on behalf of the California Class against Defendants.

95.    Plaintiff J.P. and California Class members are consumers within the meaning of California Civil Code § 1761(d) of the CLRA.

96.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

97.    Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

98.    Defendants violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its 7-OH Products are addictive, an unreasonable health hazard and necessarily a fact which is material to reasonable consumers.

99.    Defendants' misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

100.    Defendants have exclusive or superior knowledge of 7-OH's addictive nature, which was not known to Plaintiff J.P. or California Class members.

101.    Plaintiff J.P. and California Class members have suffered harm as a result of these violations of the CLRA, Civil Code § 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that 7-OH is addictive and causes withdrawals. As a result, Plaintiff J.P. and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorney's fees and costs, declaratory relief, and punitive damages.

102.    On May 30, 2025, Plaintiffs' counsel sent Defendants a CLRA notice letter, which complies in all respects with § 1782(a). The letter was sent via certified mail, return receipt requested, and

---

THIRD AMENDED CLASS ACTION COMPLAINT                                         21

advised Defendants that they were in violation of the CLRA and demanded Defendants cease and desist from such violations and make full restitution by refunding the monies received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.

**THIRD CAUSE OF ACTION**
**Violation of Oregon's Unlawful Trade Practices Act ("UTPA")**
**OR. REV. STAT. § 646.605 *et seq.***
***(On Behalf of Plaintiff M.L. and the Oregon Class)***

103. Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs.

104. Plaintiff M.L. brings this claim individually and on behalf of the members of the proposed Oregon Class against Defendants for violations of the UTPA, Or. Rev. Stat § 646.605, *et seq.*

105. The UTPA is intended to be interpreted liberally to protect consumers, covering a broad spectrum of unfair or deceptive practices in trade or commerce.

106. The unlawful methods, acts and practices pled herein were committed in the course Defendants' business. ORS § 646.608(1).

107. Defendants are a "person," as defined by ORS § 646.605(4). Defendants are engaged in "trade" and "commerce" in Oregon by advertising, offering or distributing for sale goods that directly or indirectly affect the people of the State of Oregon, as defined by ORS § 646.605(8).

108. Defendants' 7-OH Tablets are "goods" that Plaintiff M.L. and the proposed Oregon Class obtained primarily for personal purposes, as defined by ORS § 646.605(6).

109. ORS § 646.608(1)(e) states that it is an unlawful business practice for a company to represent that their goods sold have characteristics, ingredients, uses, or benefits that they do not have. This provision is specifically intended to prevent economic harm based on deceptive commercial practices and extends to omissions.

110. A "representation" under ORS § 646.608(1) is any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

111. The Supreme Court of Oregon has clarified that for a defendant to violate the UTPA provisions prohibiting misrepresentations about a product's attributes, it is not required that the misrepresentations be material to consumer purchasing decisions. *See State ex rel Rosenblum v. Living*

*Essentials, LLC*, 371 Or. 23 (2023). This means that any misrepresentation about the product, regardless of its influence on the purchasing decision, can be actionable under the UTPA.

112. Defendants have further engaged in "unconscionable tactics" by knowingly taking advantage of consumers' physical infirmity and ignorance, knowingly permitting customers to enter into transactions in which the customers will derive no material benefit. ORS § 646.605(9).

113. Defendants' unlawful omissions, acts, and practices pled herein were "willful violations" of ORS § 646.608 because Defendants knew or should have known that Defendants conduct was a violation, as defined by ORS § 646.605(10).

114. Defendants' methods, acts and practices, including Defendants' representations, omissions, active concealments and failures to disclose, violated and continue to violate the UTPA.

115. With respect to omissions, Defendants at all relevant times had a duty to disclose the information in question because: (i) Defendants had exclusive knowledge of material information that was not known to Plaintiff M.L. and the Oregon Class (i.e., that 7-OH is highly addictive); (ii) Defendants concealed material information from Plaintiff M.L. and the Oregon Class; and/or (iii) Defendants made partial representations which were false and misleading absent the omitted information.

116. Defendants' misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

117. Defendants engaged in these reckless or knowing use of these unlawful methods, acts or practices alleged herein which have been declared unlawful by the UTPA.

118. As a direct, substantial and/or proximate result of Defendants' conduct, Plaintiff M.L. and the Oregon Class members suffered compensable and ascertainable losses.

119. Plaintiff M.L. and the Oregon Class members would not have purchased the Products at the prices they paid if they had known the harmful opioid-like effects of 7-OH consumption and/or its addiction and withdrawal symptoms.

120. Plaintiff M.L. seeks on behalf of himself and the Oregon Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate equitable relief, including restitution, as appropriate; and (4) attorneys' fees and costs pursuant to ORS § 646.638, *et seq.*

121.    This action was brought "within one year after the discovery of the unlawful method, act or practice." ORS § 646.638(6). By Defendants' design, their misrepresentations and omissions regarding the effects of the ingredients in their kratom Products made it virtually impossible for the typical consumer to discover the truth. Plaintiff M.L. and members of the proposed Oregon Class were reasonable consumers who trusted Defendants' representations when they purchased Defendants' kratom Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, and on behalf of the Classes, respectfully requests this Court award relief against Defendants as follows:

a.    an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.    award Plaintiffs and members of the Classes actual, consequential, punitive, and statutory damages, as appropriate;

c.    award restitutionary disgorgement and non-restitutionary disgorgement, to the extent permitted by law, of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the members of the Classes as a result of Defendants' unlawful, unfair, and fraudulent business practices described herein;

d.    *cy pres* award of any portions of *non*-restitutionary disgorgement, to the extent permitted by law, of all profits and unjust enrichment that Defendants obtained from *any* source as a result of the immoral and illegal conduct alleged herein to a non-profit addiction research and treatment center that specializes in opioid and kratom-related substance use disorder, treatment, prevention, and research.

e.    award declaratory relief as permitted by law or equity, including directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

f.    award attorneys' fees and costs; and

g.    award any other further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 17, 2026

**LYNCH CARPENTER, LLP**

By: */s/ Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Tel:    (619) 762-1910
Fax:    (858) 313-1850

**BURSOR & FISHER, P.A.**
Neal J. Deckant (SBN 322946)
ndeckant@bursor.com
Luke Sironski-White (SBN 348441)
lsironski@bursor.com
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Tel.:    (925) 300-4455
Fax:    (925) 407-2700

*Attorneys for Plaintiffs*
*and Proposed Class Counsel*